THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* JOSEPH LEWIS, JOSEPH KAUFMAN, NATHAN HAHN, ANNA SIMS, ARTHUR FISHBEIN, HORACE MEAD, SID GASKOWITZ and GERTRUDE RAPPAPORT, Defendants.

City Magistrate's Court of New York, Borough of Brooklyn, June 29, 1945.

*Daniel P. A. Sweeney* and *Abraham P. Chess* of the Legal Bureau of the Police Department of the City of New York, for plaintiff.

*Joseph H. Goldstein* for defendants.

SALA, J. The defendant Joseph Lewis and seven others similarly accused under separate complaints are charged with having violated section 435–10.1 of the Administrative Code of the City of New York. This statute is commonly known and referred to as the " puller-in " law. The facts are conceded by the prosecution and the defense, and without the taking of testimony the cases have been submitted to this court as a question of law and for judicial interpretation of the statute upon the following agreed stipulation of facts:

The defendant Joseph Lewis and seven others are alleged to have stood in front of the entrances of their respective premises located on the principal avenue of Coney Island, a world-renowned summer resort, and while over the building line, on private property, called out to passers-by walking on the public street to come in and have their photographs taken. In addition to making outcries by mouth to pedestrians, with accompanying gestures, to " step in and get your photos taken ", it is also alleged that two defendants used mechanical sound devices, presumably to better attract, draw and solicit trade from the multitude visiting the amusement resort.

The language of the statute alleged to have been violated by these defendants is rather all-embracing, broad, loose and general in phraseology. It, therefore, becomes essential as a matter of judicial interpretation, in order to avoid any unconscionable injustice, to carefully attempt to determine the legislative intent and purpose, and the evils sought to be suppressed or corrected by this law. Obviously, it was never intended by a legislative body in a democracy to deprive its citizens of their basic and inalienable constitutional rights, or to illegalize their legitimate efforts directed toward advancing their commercial or professional enterprises, when such efforts are in strict accordance and conformity with the custom and practice prevailing and intrinsically common to such enterprises in an amusement center as Coney Island.

The barker who by his ballyhoo seeks to attract attention to his side show or place of amusement and by his active demonstration and noisy advertisement, a natural concomitance of all public fairs, circuses and outdoor amusement resorts, attempts to induce patrons to enter, and, the hawker who makes lavish and dramatic outcries as to the merits of his wares sold in

his establishment, follow a traditional and historical technique which it may very accurately be said " is the very life and breath of the world's most famous outdoor amusement resort " and " constitutes part of the color and excitement which passers-by or visitors expect and enjoy." Was it the legislative intent to remove this atmosphere, to suppress the feeling of gaiety, healthy frivolity and abandon that such clamor inspires? Was it the legislative purpose to extirpate the normal stimulation and excitement induced in the mind and spirit of man by the ballyhoo, the barker, and the hawker invariably present in all outdoor amusement resorts such as Coney Island, the poor man's haven of relief? To ask the question is to answer it. This court unhesitatingly thinks not. The ballyhoo and barking are the lifeblood and are inherent and inextricable parts of the fundamental pattern of outdoor amusement resorts and public fairs. Without it Coney Island would be converted into a mausoleum for its million of daily visitors.

The pertinent part of section 435-10.1 of the Administrative Code of the City of New York sought to be applied against these defendants, reads as follows: " *Solicitation of pedestrians by pullers-in.* — a. It shall be unlawful for any person to stand, or cause or permit any person to stand, on the sidewalk or street in front of, or in the entrance or hallway of any store or building for the purpose of calling the attention of passersby to goods, wares or merchandise displayed or on sale in such store or any other store or building, or to solicit patronage for any business or service, or to attempt by word of mouth or gesture, or by the distribution of handbills or other printed matter, or by the use of mechanical or sound making devices, to entice or persuade passersby to enter such store or building, or any other store or building, or to accept the services of any business."

In construing this statute and its applicability the Court of Appeals of the State of New York, in unanimously reversing the conviction of the defendant in the case of *People* v. *Realmato* (294 N. Y. 45, 47) set down certain guide posts which indicate the correct path for judicial construction. In that case two women who were " standing in the entrance arcade and inspecting some fur goods on display, were approached by the appellant, a salesman, who asked one of them whether she was interested in a fur coat. * * * he asked permission to show her a few coats, motioned her into the store, [and] followed her in * * *."

There was no question that in this case the women solicited by the defendant were over the building line and on private property when personally accosted and directly approached by him. The Court of Appeals, consequently, solely on the theory that the women were not pedestrians or passers-by within the meaning and intent of the statute when personally accosted stated as follows (p. 49): "Going to the precise wording of the statute, we hold that complainant here was not a 'passerby' or 'pedestrian' as she stood in the vestibule, looking over the garments on display, and that defendant, in persuading her to enter the store, was not a 'puller-in.' 'Passersby' and 'pedestrians' are not words of precise definition but they have to be stretched pretty far before they can refer to those who have deviated from the line of street travel and turned into a place owned and occupied for private business purposes. The use of the word 'pullers-in' in the statute's heading, which heading we may use as an aid to construction (*People* v. *Molyneux*, 40 N. Y. 113, 119), is more illuminating. 'Puller-in' has a dictionary meaning of 'a man who stands in front of a cheap shop, place of entertainment, or the like, and urges passers-by to enter, sometimes laying hold of them' (Webster's New International Dictionary [2d ed.], unabridged, 1942). From the whole language, including the heading, of the statute here under scrutiny, we conclude that it was not intended to interdict peaceful, orderly solicitation by a merchant or persons who have entered such a vestibule on the merchant's private property."

There is, however, reasonable certainty for belief, that if, in *People* v. *Realmato* (*supra*), the women had been pedestrians, then the act of this defendant in *personnally accosting* and *directly* and *intimately approaching* them in *personal solicitation*, as distinguished from a general and impersonal barking or hawking, would properly have resulted in his conviction as a " puller-in " within the meaning and intent of the statute.

It is evident from an analysis of *People* v. *Realmato* (*supra*) and from a study of the statute under construction that two elements must be proved by the prosecution to sustain a conviction. (1) The person solicited must be a pedestrian or passer-by, i.e., the prospective customer must be on the public street at the time of solicitation and not on the private premises of the solicitor. (2) The defendant must *personally* accost and approach and must *personally* urge and importune the prospective customer with *direct* and *personal* solicitation to be constituted a " puller-in " and come within the purview and scope

of the statute. This second requirement is clearly delineated in *People* v. *Realmato* (*supra*) on page 49 of the Court of Appeals' decision: " Our attention is called to a number of cases enforcing city ordinances, in other States, which outlawed the activities of ' touts ' or ' runners ' but in none of those cases, so far as we can find, was there any effort to apply the law against a merchant crying his own wares in his own establishment."

It is this court's opinion that the defendants in the instant cases were merely " crying his own wares in his own establishment." It is conceded by the prosecution that such outcries were made by these defendants while standing on private property. It is further conceded that these defendants did not *personally* accost and *personally* approach the pedestrians with direct and *personal* importunities, urgings, or solicitation. The acts of the defendants were simply the manifestations of a technique of ballyhoo common to barkers and hawkers. It is this court's opinion that without *personal* accosting there can be no " pulling-in."

The complaints against Joseph Lewis and seven other defendants similarly charged under separate complaints are dismissed.